Elizabeth Rosalia **WOODBY**, Petitioner,

v.

**IMMIGRATION & NATURALIZATION
SERVICE**, Respondent.

No. 15637.

United States Court of Appeals
Sixth Circuit.

Sept. 16, 1965.

Sidney G. Kusworm and Jacob A. Myers, Dayton, Ohio, for petitioner, Kusworm & Myers, Dayton, Ohio, on the brief.

Charles G. Heyd, Asst. U. S. Atty., Cincinnati, Ohio, for respondent, Joseph P. Kinneary, U. S. Atty., Cincinnati, Ohio, on the brief.

Before MILLER, O'SULLIVAN, and PHILLIPS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This case is before us upon the petition of Elizabeth Rosalia Woodby to review and vacate an order of the Board of Immigration Appeals entered on May 27, 1963, denying her Motion to Reconsider its earlier order of March 8, 1963. The March order dismissed her appeal from an order of a Special Inquiry Officer directing that she be deported to Germany. The deportation proceedings were had under 8 U.S.C.A. § 1251(a) (12), which provides that,

> "(a) Any alien in the United States * * * shall * * * be deported who—
>
> \* \* \* \* \* \*
>
> (12) by reason of any conduct, behavior or activity at any time after entry became a member of the classes specified in paragraph (12) of section 1182(a) of this title; * * *."

Section 1182(a) (12) defines as a class subject to exclusion,

> "(12) [a]liens who are prostitutes or who have engaged in prostitution * * *."

The Special Inquiry Officer conducted a hearing pursuant to 8 U.S.C.A. § 1252, at which testimony was taken and petitioner was represented by counsel. Petitioner and three other witnesses testified at such hearing and affidavits of petitioner and another obtained upon prehearing investigation were received in evidence. The inquiry officer found that petitioner had engaged in prostitution as charged and ordered that she be deported. Petitioner concedes that she did engage in prostitution, but claims that she did so while acting under duress which

arose from the circumstances hereinafter set forth.

On January 8, 1955, petitioner Woodby, a native of Hungary and a citizen of Germany, married an American soldier then in service in Germany. Two children were born of the marriage. The first, a girl, was born in Germany and the second, a boy, was born prematurely in the United States on August 13, 1956. Petitioner was admitted to the United States on February 7, 1956, and went to live with her husband and daughter at the home of her husband's parents in Harlan, Kentucky. A few months later petitioner and her husband moved to Dayton, Ohio, where the second child was born. Petitioner's infant daughter was then living with her paternal grandparents in Kentucky. It is clear from the evidence that petitioner's husband gave little attention to the support and care of his wife and children.

Petitioner and her husband and the new born son lived for a time in Dayton until, as claimed by petitioner, the husband left her in early 1957, taking the son with him, and presumably took up residence in Harlan, Kentucky, with his parents and children. The husband was killed in an automobile accident about July 14, 1957.

It was after her husband left her that petitioner entered into the practice of prostitution. Her account of the facts which she claims made such conduct the product of duress is as follows.

While working to support herself, and about April 1, 1957 (later changed to February 7, 1957), she got a telephone call from her husband, who told her that their infant son was seriously ill and needed an operation that would cost $300.00. He stated that he had no money or Blue Cross insurance and requested her to provide the needed cash. The next day while petitioner was alone in her apartment contemplating her plight and crying, fearful that her son would die unless she could get the money for his operation, a vacuum cleaner salesman came to her apartment. Observing petitioner's apparent state of anxiety, this man asked the cause and told her he could help her get the money. He left momentarily and shortly returned with another man and a bottle of whiskey. After petitioner had consumed some whiskey, this vacuum cleaner salesman and part-time panderer proposed that he would lend petitioner the needed money to be repaid with her earnings as a prostitute from customers he would procure. She was importuned to disrobe and have some pictures taken in the nude, presumably to aid the procurer to attract business to her. Petitioner thereupon began the regular practice of prostitution, carrying it on in addition to her employment as a waitress. She continued in this enterprise until she had earned enough to and did repay the loan. She testified that she ceased her life as a prostitute about July 1, 1957 (later changed to early April, 1957), and went to Tennessee, later to return to Dayton with a woman friend. She stated that she did not thereafter engage in prostitution, although she admitted to continuing sexual relations with a man whose first meeting with her was to keep a prostitution engagement.

A very confused record ends its identification of petitioner's activities with the latter part of the year 1958. What occurred between then and the immigration authorities' investigation of her in about the middle of 1961 is not revealed. The record suggests some effort on petitioner's part to regain custody of her children from her husband's parents, but the record is silent as to the outcome. The record is likewise silent as to how and why the immigration authorities became interested in petitioner at least three years after, as far as the record before us discloses, she discontinued activities as a prostitute. We have been told nothing as to the legal custody of petitioner's children, except for the observation in the decision of the Special Inquiry Officer that "since her citizen children are now in the legal custody of respondent (*sic*) father-and mother-in-law, there is no basis for considering that her deportation would

result in extreme hardship to her children." The appendices before us give no advice as to the basis for such observation nor whether the grandparents in any way excited the government's interest in deporting petitioner. The Special Inquiry Officer further said that while at the time of the hearing in 1962 petitioner's children had been with the grandparents for two years, "there is no indication that respondent has received custody of the children, although at the hearing she testified she had engaged a lawyer for proceedings to regain their custody."

The order of deportation provides that petitioner, the mother of these infant American citizens, "be deported * * * to Germany" and that if Germany will not accept her, "the respondent shall be deported to Hungary."

The evidence which has brought about her deportation was principally supplied by information disclosed to the authorities by petitioner herself, together with that of three obviously friendly witnesses called at the hearing before the Special Inquiry Officer. This officer's conclusions were based on this testimony and sworn statements earlier taken from petitioner and a gentleman friend of hers. This man testified that while his first meeting with petitioner in October, 1957, was to enjoy her availability as a prostitute, he fell in love with her and would like to marry her if he could obtain a divorce from his wife. We assume that, for whatever reason, this marriage has not yet taken place, although petitioner admits having sexual relations with this man after she had discontinued her prostitution until a time shortly before the hearing.

The decision of the Special Inquiry Officer and the affirmance of that decision by the Board of Immigration Appeals were not based upon a conclusion that petitioner's story of entering prostitution under the duress of having to raise $300.-00 to save the life of her son was false. They referred to it as a "bizarre story" and "a hard story to believe." But they concluded that whatever the circumstances that prompted its beginning, she continued to carry on the business of prostitution after the original compulsions had ceased to operate. The Board of Immigration Appeals stated,

"Even if the respondent's story is to be believed, and even if it be conceded that the circumstances under which she entered the practice of prostitution may have amounted to duress, nevertheless the continuance of the practice of prostitution until at least late 1957 is not explained and cannot be defended on the ground of duress."

It is quite apparent that the Board and the Special Inquiry Officer arrived at their factual conclusion from the many discrepancies in petitioner's testimony and its contradiction by statements made by her in her prehearing sworn statement. There was much confusion as to the places at which and the times during which she carried on as a prostitute. Such confusion would permit a finding that her activity in this regard extended into late 1957 and possibly late 1958, and that she was freed of the claimed duress in early 1957. There is no evidence of prostitution by her after 1958 and in her address to this court she implied that she has been leading an exemplary life since the latest date that the proofs established prostitution. She testified at the hearing that she has not returned to prostitution, and the three other witnesses testified to her good character and reputation. We are not informed as to the custodial status of her children from and after the proven period of her prostitution. Her hearing was held March 28, 1962, the Special Inquiry Officer's decision was rendered October 30, 1962, her appeal to the Board of Immigration Appeals was dismissed March 8, 1963, and her Motion to Reconsider was denied on May 27, 1963. The Motion to Reconsider, verified by her oath, did not rely upon a claim of her children's need for her. Further evidence of her continued good behavior or her children's need for her might move the immigration authorities to withhold the seeming cruelty of tearing a young mother from

**992**

her children and sending her from the country of which they are citizens. Even if it were our function to appraise the harshness of the deportation of this petitioner, we do not have sufficient facts before us upon which to form our own judgment thereon. We believe that our function ends when we find, as we do, that the Board's underlying order is "supported by reasonable, substantial, and probative evidence on the record considered as a whole * * *," 8 U.S.C.A. 1105a(a) (4), and that denial of petitioner's Motion to Reconsider was not an abuse of discretion. The Board made out its case and it is not for us to say that petitioner's post-prostitution good conduct, if such had been proved, required forgiveness and the withholding of deportation. We are not at liberty here to proceed on the basis of what we might have done had we been in the position of the immigration authorities.

Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) held that denial of a Motion to Reopen is a final order, reviewable by this Court even though such review is sought more than six months from the order of deportation, but within six months of denial of a motion to reopen. The respondent Immigration and Naturalization Service contends that inasmuch as the petition for review here was filed more than six months from the date of the order of March 8, 1963, affirming the order of deportation, we are limited to reviewing the discretionary denial of the Motion to Reconsider. See 8 U.S.C.A. § 1105a(a) (1).

Petitioner contends that her Petition for Review requires that we test the Board's action under 8 U.S.C.A. § 1105a (a) (4) which seemingly permits us to consider whether the underlying order was supported by "reasonable, substantial, and probative evidence on the record considered as a whole." We need not decide this suggested limitation upon our review powers because, as stated above, we are persuaded that the Board orders must be affirmed on either ground.

It is so ordered.